UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH BROWN, III,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Case No. 2:20-cv-11082
District Judge Sean F. Cox
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.    Introduction

This is a social security case.  Plaintiff Joseph Brown, III (Brown) brings this action under 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed summary judgment motions (ECF Nos. 12, 14), which have been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).

1

For the reasons set forth below, substantial evidence supports the Administrative Law Judge's (ALJ) conclusion that Brown is not disabled under the Act.  Accordingly, it is RECOMMENDED that the Commissioner's Motion for Summary Judgment (ECF No. 14) be GRANTED, Brown's Motion for Summary Judgment (ECF No. 12) be DENIED, and the ALJ's decision be AFFIRMED.

## II.    Background

### A.    Procedural History

Brown was 41 years old at the time of his alleged date of onset of February 21, 2017.  (ECF No. 10-5, PageID.223).  He worked for FedEx Express, as a lead medical support assistant, for Metropolitan Building Services, for the United States Army National Guard, and for the United States Postal Service from 2003 to 2017.  (ECF No. 10-6, PageID.263).  He alleged disability due to back injury, degenerative disc disease, low back lumbar fusion, osteoarthritis left knee, osteoarthritis right knee, arthritis in back, herniated disc, and bipolar disorder.  (*Id*., PageID.262).

After Brown's DIB application was denied at the initial level on November 21, 2017 (ECF No. 10-3, PageID.113-129), he timely requested an administrative hearing, which was held on February 6, 2019, before the ALJ.  (ECF No. 10-2, PageID.78-111).  Brown testified at the hearing, as did a vocational expert (VE).  (*Id*.).

2

Brown testified that he lived with his wife and 16-year-old daughter. (*Id*., PageID.85-86). He served in the Marine Corps and later in the National Guard. (*Id*., PageID.85). He graduated from college. (*Id*.). Most recently, Brown worked as a lead medical support assistant at the Department of Veterans Affairs. (*Id*., PageID.87). He was "[b]asically, a supervisor who managed people and managed clinics." (*Id*., PageID.87). He had to lift up to 50 pounds in the course of his job duties. (*Id*.). Brown stopped working in February of 2017, because of his back pain. (*Id*., PageID.91). The pain put tears in his eyes and made it difficult for him to get out of bed. (*Id*.).

After going to the doctor, it was recommended that Brown get spine surgery, specifically a fusion. (*Id*.). This was not Brown's first back surgery. (*Id*.). The fusion was completed in March of 2017. (*Id*., PageID.91-92). X-rays completed after his surgery revealed shifting that might require another surgery. (*Id*., PageID.92). Brown refused. (*Id*.). After the fusion, Brown's right foot went "basically numb" and he could no longer "feel four out of five of [his] toes." (*Id*.). Brown also developed bone spurs on his left because of putting too much weight on his left side. (*Id*., PageID.93). Brown still experiences "constant" pain in his back. (*Id*., PageID.93-94). Brown has tried to relieve the pain with yoga, acupuncture, and physical therapy. (*Id*., PageID.93). He used a cane to ambulate outside of the house and a walker to ambulate inside of the house. (*Id*., PageID.94-

3

95).  Brown estimated that he spent 80% of his day in bed because of his back

pain.  (*Id.*, PageID.95).  Brown could sit for approximately 10 to 15 minutes before

needing to stand due to his back pain.  (*Id.*, PageID.99-100).  He could stand for

approximately five minutes before needing to sit and could walk from a handicap

spot to a building.  (*Id.*, PageID.100).  He could carry about 10 pounds.  (*Id.*).

Brown had a meniscectomy done on his right knee.  (*Id.*, PageID.96).  He

received injections in both knees.  (*Id.*).  His symptoms included weakness, pain,

and swelling.  (*Id.*).  He was also diagnosed with plantar fasciitis in both of his

heels as well as bone spurs on his left heel and ankle.  (*Id.*, PageID.97).  Brown

also suffered from asthma and high blood pressure that was controlled with

medication.  (*Id.*, PageID.97-99).  He experienced "[s]harp pain" in his left

shoulder caused by arthritis as well as neck pain.  (*Id.*, PageID.98-99).

Brown also suffered from several psychological conditions.  (*Id.*,

PageID.101).  His symptoms included "[m]ood swings, anger, want[ing] to be left

alone, isolation, . . . anxiety."  (*Id.*).  He also experienced heart palpitations and

suffered from nightmares.  (*Id.*).

On April 19, 2019, the ALJ issued a written decision finding that Brown was

not disabled.  (*Id.*, PageID.50-68).  On March 6, 2020, the Appeals Council denied

review, making the ALJ's decision the final decision of the Commissioner.  (*Id.*,

PageID.44-46).  Brown timely filed for judicial review of the final decision.  (ECF No. 1).

### B.    Medical Evidence[1]

On February 24, 2017, Brown presented to the emergency department complaining of chronic back pain which had flared up three weeks earlier.  (ECF No. 10-9, PageID.870-871).  Brown rated the pain as a ten out of ten and was given Toradol for the pain.  (*Id*., PageID.871).  The physician recommended considering epidural injections before considering surgical intervention.  (*Id*., PageID.875).  The physician provided recommendations for pain relief including over-the-counter medications and use of heating pads and massages.  (*Id*.).

Three days later, on February 27, 2017, Brown again presented to the emergency department complaining of back pain.  (ECF No. 10-7, PageID.462).  Brown "appear[ed] distressed." (*Id*., PageID.463).  Brown had "[n]ormal range of motion," but "[h]e exhibit[ed] tenderness." (*Id*.).  Brown was discharged with medication and pain he rated as an eight out of ten.  (*Id*., PageID.464).

On March 1, 2017, Brown presented to his primary care physician, Timothy J. Horrigan, M.D.  (ECF No. 10-12, PageID.1517).  Brown reported that he was having a flare up of low back pain.  (*Id*.).  He was ambulating with a cane.  (*Id*.).

---

[1] There is medical evidence predating the alleged onset date of February 21, 2017, in the file.  The medical evidence portion of this report will only address medical evidence dated February 21, 2017, or later.

Dr. Horrigan prescribed Brown Percocet and ordered an MRI of his lumbar spine.

(*Id.*).

Also on March 1, 2017, Brown had an MRI of his lumbar spine.  (ECF No.

10-7, PageID.460).  The findings were as follow:

> 1. Moderate sized right paracentral disc protrusion at L5-S1.
> 2. Lumbar spondylosis with facet arthropathy.  Findings are most prominent at L5-S1 which demonstrates moderate narrowing of the central canal with effacement of the right lateral recess and narrowing of the left.  There is also moderate bilateral neural foraminal narrowing. At L4-L5 and L3-L4, there is mild narrowing of the central canal.

(*Id.*, PageID.461).

On March 6, 2017, Brown presented to Kanwealdeep Sidhu, M.D.

complaining of "excruciating pain in the right buttock, thigh and leg."  (ECF No.

10-7, PageID.353).  Brown had been bedridden for 10 days.  (*Id.*).  Dr. Sidhu noted

that Brown had back surgery in July of 2015, specifically "a laminotomy L4-5, L5-

S1 on the right with excision of disc."  (*Id.*).  Brown was using a cane to ambulate

and appeared to be "in moderate distress due to pain."  (*Id.*).  Dr. Sidhu discussed

options with Brown, and Brown decided to move forward with back surgery.  (*Id.*,

PageID.354-355).

On March 11, 2017, Dr. Sidhu performed back surgery on Brown at St. John

Hospital & Medical Center.  (*Id.*, PageID.315).  Brown's preoperative and

postoperative diagnoses were "[f]ailed back syndrome with internal disc

derangement, stenosis, recurrent herniated disk, L5-S1, right."  (*Id.*).  The surgery

included the insertion of a cage.  (*Id*).  On March 14, 2017, Brown was assessed before his hospital discharge.  (*Id*., PageID.356).  He indicated that his pain was well-controlled, but that three of his right toes were numb.  (*Id*.).

On March 20, 2017, Brown presented for a postoperative appointment and it was noted that he was doing "quite well."  (ECF No. 10-7, PageID.424; ECF No. 10-12, PageID.1514).  "The pain ha[d] basically come out of his leg."  (ECF No. 10-7, PageID.424).  Brown was experiencing "a little numbness still to his right foot."  (*Id*.).  He rated his low back pain as a five out of ten.  (*Id*.).  His pain was controlled with Percocet and spasms were controlled with Robaxin.  (*Id*.).  Brown's mood was "stable" and "he [was] pleased with how he [was] doing so far."  (*Id*.).  Brown was ambulating with a walker and "[was] moving about without great difficulty."  (*Id*.).

On March 28, 2017, Dr. Sidhu authored a letter regarding a postoperative appointment with Brown.  (*Id*., PageID.440).[2]  Dr. Sidhu wrote that Brown had been receiving in-home physical therapy, but that Brown no longer wanted to receive this service.  (*Id*.).  Brown denied pain but did indicate that he had some numbness in his toes.  (*Id*.).  Brown's "incision look[ed] good."  (*Id*.).  The cage appeared to be in a "good position."  (*Id*.).  Brown was using a walker to ambulate,

---

[2] Progress notes for the March 28, 2017 visit are also in the record.  (ECF No. 10-8, PageID.631-632).

7

but Dr. Sidhu indicated that he may progress to using a cane or nothing at all. (*Id*.).

On April 25, 2017, Brown presented to Dr. Sidhu for an appointment.  (ECF No. 10-8, PageID.629).  Brown had no radicular complaints but did report some lower back discomfort as well as numbness in his right foot.  (*Id*.).  Brown had five out of five "motor strength in both lower extremity muscle groups." (*Id*.).  X-rays showed that the cage had not significantly changed location.  (*Id*., PageID.630). Dr. Sidhu cautioned Brown "about bending, twisting, turning, [and] lifting activities." (*Id*.).

On June 16, 2017, Brown walked into Veterans Affairs (VA) requesting pain medication.  (*Id*., PageID.488).  The nurse indicated she would forward the request to Brown's primary care physician.  (*Id*., PageID.489).

On June 27, 2017, Linda McParlan, N.P. examined Brown.  (ECF No. 10-7, PageID.435; ECF No. 10-8, PageID.627-628).  She noted that Brown "ha[d] no lower extremity motor deficits, no nerve root tension signs." (ECF No. 10-7, PageID.435).  "X-rays of the lumbar spine reveal[ed] that the fusion [was] stable, satisfactory alignment.  It appear[ed] that the L4-5 cage ha[d] slightly shifted." (*Id*.).

On July 11, 2017, Dr. Sidhu authored a letter regarding Brown's restrictions. (*Id*., PageID.431).  Dr. Sidhu noted that "[h]e ha[d] some posterior extrusion of the

8

interbody cage at the cephalad level, L4-5." (*Id*.).  However, Brown was not having "any radicular symptoms or motor loss associated with it." (*Id*.).  Brown rated his pain an eight out of ten.  (*Id*.).  Dr. Sidhu wrote that he had advised Brown "to be careful with bending, twisting, turning and lifting activities." (*Id*.).  He also indicated that if there was further cage extrusion then it may need to be removed.  (*Id*.).

On July 27, 2017, Brown had a compensation and pension examination with VA.  (ECF No. 10-8, PageID.476-477).  Brown reported that he had pain in the little fingers of both hands and that "he ha[d] difficulty gripping objects with the right hand." (*Id*., PageID.480).  Brown further reported that "[p]ain intensity flare[d]-up with cold weather and rain." (*Id*.).  Brown did not have full range of motion in either of his hands.  (*Id*., PageID.480-483).  Nonetheless, Brown was "able to perform repetitive use testing with at least three repetitions[.]" (*Id*., PageID.483).  Brown also had five out of five grip strength in both hands.  (*Id*., PageID.486).  Imaging studies revealed arthritis in Brown's right hand.  (*Id*., PageID.487).  The only occupational limitation noted was Brown's ability to grip with his right hand.  (*Id*., PageID.488).

On August 2, 2017, Brown presented for outpatient care complaining of sharp pain on the right side of his lower back in addition to "shooting pain along the posterior aspect of right thigh, with occasional numbness and tingling." (ECF

No. 10-9, PageID.851).  Pain medication was not helping alleviate the pain nor were physical therapy or yoga.  (*Id.*).  Brown had a two-view examination of the lumbar spine.  (*Id.*, PageID.645).  The impression was "[p]ostoperative changes with fixation rods and screws at the L4-S1 levels."  (*Id.*).

On August 7, 2017, Dr. Sidhu authored another letter.  (ECF No. 10-7, PageID.433).[3]  He wrote that Brown continued to report back pain that he rated an eight out of ten.  (*Id.*).  Brown also reported spasms, occasional right calf discomfort, and toe numbness.  (*Id.*).  Brown was not using a cane or walker to ambulate.  (*Id.*).  Brown did not have any motor loss.  (*Id.*).  "The cage [was] extruded from the initial presentation and the intraoperative findings."  (*Id.*).  Brown told Dr. Sidhu that he was uninterested in cage removal.  (*Id.*, PageID.434).

On August 14, 2017, Brown was issued a maxi rollator, a type walker, to assist with ambulation.  (ECF No. 9, PageID.844).  On August 16, 2017, a note indicated that Brown had requested a scooter to assist with ambulation.  (*Id.*, PageID.679).  The author of the note, an occupational therapist, indicated that Brown did not need a scooter.  (*Id.*).

On September 1, 2017, Brown presented to Dr. Sidhu.  (ECF No. 10-14, PageID.1862).  Brown told Dr. Sidhu that he felt " 'defeated.' "  (*Id.*).  He asked

---

[3] Progress notes for the August 7, 2017 visit are also in the record.  (ECF No. 10-8, PageID.625-626).

Dr. Sidhu to "take him off work." (*Id*.).  Brown was experiencing pain in his right

lower back, right buttock and thigh, left ankle, and knees. (*Id*.).  Brown had also

resumed using a cane. (*Id*.).  X-rays demonstrated that Brown's cage had not

changed position and the MRI[4] did "not show any severe impingement of any

nerve root due to the extruded cage." (*Id*., PageID.1864).  The MRI did reveal

"some scar tissue in the L5-S1 area." (*Id*.).  "There [was] minor bulging L3-4."

(*Id*.).

On September 29, 2017, Brown returned to Dr. Sidhu. (*Id*., PageID.1858).

Brown reported "some numbness in the right leg that [came and went]." (*Id*.).  He

also "ha[d] discomfort in the left iliac crest, some aching in the left ankle." (*Id*.).

Brown's "extruded cage at L4-5 which [was] unchanged for the past several

months." (*Id*., PageID.1860).

On October 2, 2017, Brown presented to Dr. Horrigan for an evaluation so

Dr. Horrigan could complete disability forms for Brown. (ECF No. 10-12,

PageID.1512-1513).  The VA and Dr. Sidhu allegedly refused to complete the

forms. (*Id*., PageID.1512).  Brown used a cane for ambulation. (*Id*.).  He

experienced constant low back pain along with numbness and tingling in his right

foot. (*Id*.).  His back pain improved when reclining or lying down. (*Id*.).  Brown's

---

[4] The MRI report is located in the record. (ECF No. 10-14, PageID.1892-1893).

knees also had decreased range of motion along with aching and intermittent swelling. (*Id*.).

On October 12, 2017, Brown had another compensation and pension examination with VA. (*Id*., PageID.1537). Brown had an abnormal range of motion and it was noted that he "may be limited in performing tasks that involve the back." (*Id*., PageID.1541-1542). There was "localized tenderness or pain on palpation of the joints or associated soft tissue of the thoracolumbar spine (back)[.]" (*Id*., PageID.1152). Brown did not have muscle spasms of the thoracolumbar spine. (*Id*., PageID.1543). He used a cane to ambulate. (*Id*., PageID.1546). The examiner noted that "[Brown] would be limited in performing tasks that involve heavy lifting, pushing or pulling." (*Id*., PageID.1547).

On October 18, 2017, Brown presented to physical medicine and rehabilitation complaining of right leg and back pain. (*Id*., PageID.1549). Brown "ha[d] normal reflexes at the knees but absent at the right ankle. He ha[d] decreased light touch at the right foot and lateral calf. He ha[d] normal strength except with right great toe extension and dorsiflexion which may be pain inhibition." (*Id*.). Furthermore, "[t]he electrical findings [were] consistent with a sub-acute right S1 Radiculopathy with ongoing denervation noted. There [was] no electrodiagnostic evidence of left lower extremity radiculopathy." (*Id*., PageID.1550).

On October 27, 2017, Brown presented for an appointment with Rubab

Ferdous Huq, M.D. to address his back pain.  (ECF No. 10-13, PageID.1766).  Dr.

Huq addressed Brown's lumbar radiculopathy, hypertension, hyperlipidemia, and

bipolar disorder.  (*Id*., PageID.1769).  In regard to Brown's lumbar radiculopathy,

Dr. Huq recommended that he continue to take all prescribed medications, consider

epidural injections before considering surgery, continue to participate in physical

therapy, and continue to use his TENs unit, heating pad, and receive massages.

(*Id*.).  Dr. Huq suggested that Brown do "light exercises with out lifting heavy

weight."  (*Id*.).  He further suggested that Brown "[a]void activities that

aggravate[] back pain."  (*Id*.).  Brown was using a cane to assist with ambulation.

(*Id*., PageID.1773).

On October 25, 2017, and November 1, 2017, Brown presented to St. Clair

Orthopedics and Sports Medicine PC for knee injections.  (ECF No. 10-14,

PageID.1854-1857).  On his last visit, it was noted that Brown had "[n]o effusion

bilaterally."  (*Id*.).  He also had "pretty good range of motion."  (*Id*.).  Brown still

reported pain.  (*Id*.).

On January 4, 2018, Brown presented to St. Clair Orthopedics and Sports

Medicine PC.  (*Id*., PageID.1852).  Brown reported that "he ha[d] been spending a

lot of time in bed."  (*Id*.).  He further reported that he was experiencing "quite a bit

of back pain and pain in his legs on and off."  (*Id*.).  Brown rated his pain as a five

out of ten.  (*Id*.).  Brown was not using an assistive device and was "ambulat[ing] with a steady gate."  (*Id*.).  He was also getting on and off the table without difficulty.  (*Id*.).  An x-ray "revealed that the fusion [was] stable, satisfactory alignment, positive bone consolidation.  His cage in between L4 and L5 ha[d] not moved as compared to his previous x-ray 3 months ago."  (*Id*., PageID.1852-1853).  It was suggested "that [Brown] try some physical therapy to increase his strength, endurance and stamina."  (*Id*., PageID.1853).

On January 4, 2018, McParlan wrote a letter stating that Brown was under her care because of low back surgery.  (ECF No. 10-13, PageID.1782).  Brown was "to be off work" for an undetermined duration.  (*Id*.).

On April 30, 2018, Brown returned to Dr. Huq complaining of back pain.  (ECF No. 10-14, PageID.1798).  Dr. Huq's recommendations were the same as the ones he made on October 27, 2017.  (*Id*., PageID.1801).  Brown stated that he was not currently in physical therapy and he declined restarting physical therapy.  (*Id*.).

On January 15, 2019, Brown received a letter regarding imaging of his knees.  (*Id*., PageID.1901).  Both of his knees showed evidence of worsening degenerative osteoarthritis.  (*Id*., PageID.1901-1902).  His left ankle x-ray showed abnormalities that required evaluation by a specialist.  (*Id*.).

On January 24, 2019, Dr. Horrigan completed a medical source statement (physical) for Brown.  (*Id*., PageID.1842).  Dr. Horrigan listed Brown's diagnoses

14

as severe lumbar degenerative disc disease and diffuse degenerative arthritis of the back, knees, and left ankle.  (*Id*.).  Brown's prognosis was "[f]air."  (*Id*.).  His symptoms included chronic pain, fatigue, lethargy, and depression.  (*Id*.).  Dr. Horrigan estimated that Brown would be "off task" for 25% or more of a typical day.  (*Id*., PageID.1843).  Brown could not walk any city block without experiencing pain.  (*Id*.).  Brown could only sit for ten minutes before needing to get up and could only stand for five minutes before needing to sit or walk around. (*Id*.).  Brown could sit for less than two hours each workday and stand/walk for less than two hours each workday.  (*Id*., PageID.1844).  Dr. Horrigan noted that Brown "just cannot work like this."  (*Id*.).  He also estimated that Brown would miss more than four days each month of work.  (*Id*., PageID.1845).

On February 15, 2019, Brown received an MRI of his lumbar spine.  (*Id*., PageID.1905).  The findings were as follow:

> 1. There are appears [sic] to be displacement of the intervertebral disc prothesis at L4-L5 and to the left lateral recess.
> 2. Moderate severe spinal canal stenosis above the prosthesis at L3-L4 as detailed.
> 4. [sic] Foraminal stenosis on the left at L5-S1 with right paracentral disc extrusion at L5-S1.  Correlation with CT scan of the lumbar spine is helpful to further characterize the displaced disc prosthesis at L4-L5.

(*Id*., PageID.1907).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

16

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D.

Mich. Oct. 31, 2008), citing 20 C.F.R. § 404.1520; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the

claimant throughout the first four steps. . . .  If the analysis reaches the fifth step

without a finding that claimant is not disabled, the burden transfers to the

[Commissioner]."  *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110

(6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Brown was

not disabled under the Act.  At Step One, the ALJ found that Brown had not

engaged in substantial gainful activity since February 21, 2017 (alleged onset

date).  (ECF No. 10-2, PageID.55).  At Step Two, the ALJ found that he had the

severe impairments of asthma, degenerative disc disease (status post laminectomy

and fusion L4-S1), degenerative joint disease, obesity, and bipolar disorder.  (*Id.*).

At Step Three, the ALJ found that Brown's impairments, whether considered alone

or in combination did not meet or medically equal a listed impairment.  (*Id.*,

PageID.56).

The ALJ then assessed Brown's residual functional capacity (RFC),

concluding that he was capable of performing light work except that he could:

- Perform work that can generally be done while sitting or standing,
  with the option to alternate between positions, while remaining on-
  task and at the workstation;

17

- Optionally use a handheld assistive device whenever ambulating;
- Occasionally stoop, but never crouch, crawl, kneel, or climb;
- Only occasionally lift the left upper extremity above shoulder level;
- Never be exposed to extremes of temperature or humidity, or to respiratory irritants more concentrated than those found in a typical grocery store;
- Never be exposed to industrial vibration;
- Never be exposed to workplace hazards (such as ropes, ladders, scaffolds, unprotected heights, moving mechanical parts, or hazardous machinery);
- Engage in occasional interaction with supervisors, co-workers, and the public;
- Engage in simple duties, defined as those that can be learned within 30 days, and that require little or no judgment to perform;
- Engage in predictable work activity, defined as that with only occasional changes in the work setting or general nature of the tasks performed; and
- Engage in no production-paced tasks, such as assembly line work, or fast food front counter work.

(*Id.*, PageID.58).

At Step Four, the ALJ found that Brown was unable to perform any past relevant work. (*Id.*, PageID.62). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Brown was capable of performing the jobs of administrative support clerk (150,000 jobs nationally), sorter (110,000 jobs nationally), and bench assembler (56,000 jobs nationally). (*Id.*, PageID.63-64). As a result, the ALJ concluded that Brown was not disabled under the Act. (*Id.*, PageID.69).

18

IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision under 42 U.S.C. § 405(g).  Although the court can examine

portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health*

*& Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial

review is constrained to deciding whether the ALJ applied the proper legal

standards in making his or her decision, and whether the record contains

substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775

F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,

880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42

U.S.C. § 405(g).  The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence
> to support the agency's factual determinations.   And whatever the
> meaning of substantial in other contexts, the threshold for such
> evidentiary sufficiency is not high.  Substantial evidence, this Court has
> said, is more than a mere scintilla.  It means—and means only—such
> relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotations omitted).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo.  *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)).  An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them.  *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The Court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (internal quotations omitted).  Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir.

2009) (internal quotations omitted).

## V.    Analysis

Brown raises two arguments in support of his motion for summary

judgment: (1) the ALJ failed to create an accurate RFC and (2) the ALJ's

evaluation of Brown's subjective symptoms was not supported by substantial

evidence.

## A.    RFC

First, Brown argues that the ALJ failed to include all of his documented

limitations when crafting the physical portion of the RFC.  "A claimant's RFC is

an assessment of 'the most [a claimant] can still do despite [his] limitations.' "

*Barton v. Comm'r of Soc. Sec.*, No. 2:20-cv-2182, 2021 WL 1380258, at *4 (S.D.

Ohio Mar. 25, 2021), *report and recommendation adopted*, 2021 WL 1378983

(S.D. Ohio Apr. 12, 2021) (quoting 20 C.F.R. § 416.945(a)(1)).  "A claimant's

RFC assessment must be based on all the relevant evidence in a case file." *Id.*

The SSA recently revised their medical evidence rules.  *See Revisions to*

*Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01.

Under the old rules, an ALJ had to give the medical opinion of a claimant's

treating physician controlling weight as long as it "[was] well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

21

inconsistent with the other substantial evidence" in the record (the

"treating physician rule").  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Wilson*

*v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  However, for claims

filed on or after March 27, 2017, like Brown's, the ALJ must now articulate "how

persuasive [she] find[s] all of the medical opinions and all of the prior

administrative medical findings in [the claimant's] case record."  20 C.F.R. §§

404.1520c(b), 416.920c(b).  The ALJ evaluates the persuasiveness of the medical

opinions and prior administrative medical findings by utilizing the following five

factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4)

specialization; and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors and the ALJ must

explain how she considered these factors in her decision.  20 C.F.R. §§

404.1520c(b)(2), 416.920c(b)(2).

  Specifically, Brown seems to fault the ALJ for the persuasive weight she

assigned to the opinions of Brown's VA physicians.  The ALJ considered the

opinions of Kishor Patel, M.D., Humarira Fahim, M.D., and Dr. Huq to be

persuasive because they were "consistent with the evidence as a whole."  (ECF No.

10-2, PageID.61).  Dr. Patel "opined in October 2017 that the claimant would be

limited in performing tasks that involve heavy lifting, pushing or pulling."  (*Id.*).

The ALJ found that opinion to be consistent with the opinions of Dr. Fahim and

Dr. Huq who both "opined that [Brown] could do light exercises without heavy weight and should avoid activities that aggravate back pain." (*Id*.).  Brown cites three reasons why these opinions should not have been given persuasive weight.

First, Brown notes that one opinion was from April of 2016, which was before the alleged onset date, and, thus, argues that it should not be considered. Brown similarly argues that another opinion should not have been given much weight because it was from February of 2017, before Brown's second lumbar surgery.  However, as the Commissioner points out, just because the opinions predated the alleged onset date and Brown's second lumbar surgery does not mean they are automatically irrelevant. *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) ("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability, or evidence submitted in support of an earlier proceeding, are necessarily irrelevant or automatically barred from consideration by *res judicata*.  We recognize that evidence presented at an earlier hearing or predating the onset of disability, when evaluated in combination with later evidence, may help establish disability.  This is particularly true when the disabling condition is progressive.") (emphasis omitted).

Brown also argues that two of the opinions that the ALJ cites are actually the same opinion, specifically Dr. Huq's assessment from October 2017.  However, Brown does not explain how this "error" prejudiced him.  *See Shinseki v. Sanders*,

556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.") (collecting cases).

Brown next argues that the medical opinions were not given after a functional assessment and seemed like recommendations on what Brown should do to manage his low back pain and radiculopathy.  As the ALJ summarized, both doctors "opined that [Brown] could do light exercises without heavy weight and should avoid activities that aggravate back pain."  (ECF No. 10-2, PageID.61).  Brown fails to account for the fact that the medical opinions from Dr. Huq and Dr. Fahim were both given after they performed physical examinations of Brown, and Brown cites no caselaw in support of the contention that medical opinions should only be considered after a doctor performs a functional assessment.

Brown then turns to three of the opinions from St. Clair Orthopedics and Sports Medicine PC that the ALJ found unpersuasive.  These opinions were off-work letters.  Two of the letters, dated March 14, 2017, and June 27, 2017, were for a closed period.  (*Id.*).  The March letter noted that Brown was "on total disability March 6, 2017 through July 31, 2017."  (*Id.*).  The June 2017 letter stated that Brown "is released to work on August 1, 2017" with "no bending, stooping, lifting, nothing over 10 pounds."  (*Id.*).  The ALJ concluded that "[t]hese opinions are not persuasive because they only lasted for a specific time in the past, and are

24

no longer relevant." (*Id*.).  This statement was reasonable and supported by substantial evidence.  Additionally, as the Commissioner argues, to the extent that the letters state Brown is "on total disability," they are not persuasive.  *See* 20 C.F.R. § 404.1520b(c)(3) ("Evidence that is inherently neither valuable nor persuasive" includes "[s]tatements on issues reserved to the Commissioner," such as whether a claimant is disabled or unable to work*); see also Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to [the doctor's] opinion because her conclusion that [the plaintiff] is totally disabled is a determination reserved to the Commissioner."); *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 246 n.1 (6th Cir. 2015) (determining that the physician's statement that plaintiff would be "off work indefinitely," is not a medical opinion "because it does not reflect a judgment about the nature and severity of the claimant's impairments.") (citations omitted).

In regard to the last letter from Nurse Practitioner McParlan, which was open-ended, the ALJ noted that the "opinion is not a specific function-by-function opinion, but rather a blanket statement." (*Id*., PageID.62).  It is doubtful whether the last letter, which stated that Brown was under McParlan's care because of low back surgery and was "to be off work" for an undetermined duration, even counts as a medical opinion.  (ECF No. 10-13, PageID.1782).  "The Sixth Circuit has indicated that, in order to qualify as a 'medical opinion' for purposes of social

security regulations, a treatment note must reflect a judgment about the nature and severity of the claimant's impairments and discuss the extent of a claimant's functional limitations." *Morabito v. Berryhill*, No. 1:16CV2414, 2017 WL 3503397, at *18 n.14 (N.D. Ohio July 24, 2017), *report and recommendation adopted*, 2017 WL 3494336 (N.D. Ohio Aug. 15, 2017) (collecting cases). McParlan's letter does not meet these requirements and, thus, should not have been considered a medical opinion, much less given persuasive weight as Brown suggests.

Finally, Brown argues that the ALJ improperly disregarded Dr. Horrigan's opinions on Brown's physical and mental functioning. Specifically, he argues that the ALJ improperly disregarded the opinion on Brown's physical functioning because of a statement contained in Dr. Horrigan's assessment of Brown's mental functioning.

In the mental statement, Dr. Horrigan, when asked to describe his clinical findings, wrote "All of this information contained within VA files that I have no access to." (ECF No. 10-14, PageID.1847). The ALJ interpreted this statement to mean that both of Dr. Horrigan's statements, as to Brown's mental and physical health, were premised "primarily on the claimant's reports and subjective complaints, rather than on objective findings." (ECF No. 10-2, PageID.62). However, Dr. Horrigan never stated that he lacked access to information about

Brown's physical health, only his mental health.  Accordingly, it is unclear whether Dr. Horrigan lacked access to VA records regarding Brown's physical health.  Notably, Brown does not argue the RFC failed to fully account for his mental health impairments, only his physical impairments.  As such, any error regarding the ALJ's assessment of Dr. Horrigan's mental statement was necessarily harmless.

Even if the ALJ did err when concluding that Dr. Horrigan's statement on Brown's physical health was based "primarily on the claimant's reports and subjective complaints, rather than on objective findings," this error was not outcome determinative and was, therefore, harmless.  (ECF No. 10-2, PageID.62). Here, the ALJ appears to have mistakenly attributed a statement Dr. Horrigan made regarding access to Brown's VA mental health records to mean that Dr. Horrigan did not have access to VA records relating to both his mental and physical conditions  This mistake does not change the fact that the ALJ found that Dr. Horrigan's statement regarding Brown's physical limitations was unpersuasive.

The ALJ found that Dr. Horrigan's opinions were not "persuasive or consistent with the evidence as a whole."  (*Id.*, PageID.62).  Dr. Horrigan's statement was, indeed, inconsistent with the opinion of Brown's treating physicians at the VA, namely Dr. Patel, Dr. Huq, and Dr. Fahim.  The ALJ found those physicians' opinions to be "consistent with the evidence as a whole and

27

therefore persuasive." (*Id.*, PageID.61). The VA physicians "opined that [Brown] could do light exercises without heavy weight and should avoid activities that aggravate back pain." (*Id.*). Dr. Horrigan, however, opined that Brown was totally unable to work and did not cite objective evidence to support this claim. (ECF 10-14, PageID.1844). The ALJ's finding that Dr. Horrigan's opinions were inconsistent with the medical evidence as a whole was a sufficient reason to discount his opinion. Furthermore, as the ALJ did not err when she discounted Dr. Horrigan's opinion, she was not required to rely on VE testimony based upon limitations found by Dr. Horrigan when crafting Brown's RFC. *See Casey v. Sec'y of Health & Hum. Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ . . . is required to incorporate only those limitations accepted as credible by the finder of fact.").

For the reasons discussed, even if the ALJ did err when finding that Dr. Horrigan lacked access to VA files regarding Brown's physical health, this error was not outcome determinative and does not entitle Brown to a remand. If an ALJ makes minor errors that do not affect the outcome of the case, a claimant is not entitled to remand. *Campbell v. Comm'r of Soc. Sec.*, 227 F. App'x 470, 471 (6th Cir. 2007).

B.     Evaluation of Subjective Symptoms

Finally, Brown argues that the ALJ's evaluation of his subjective symptoms was not supported by substantial evidence.

The Social Security Regulations establish a two-step process for evaluating a claimant's subjective symptoms, including pain.  20 C.F.R. § 404.1529(a); SSR 16-3p.  According to Social Security Ruling ("SSR") 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  This analysis and the conclusions drawn from it – formerly termed a "credibility" determination – can be disturbed only for a "compelling reason."  *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' . . . to 'clarify the subjective symptoms evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged pain, considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of

29

pain; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side-effect of any medication; (5) treatment, other than medication received; (6) any means used to relieve pain; and (7) other factors concerning functional limitations.  20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

Here, Brown argues that the "ALJ improperly evaluated the intensity, persistence, and limiting effects of [his] physical and mental symptoms."  (ECF No. 12, PageID.1929).  The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (ECF No. 10-2, Page.59).  The ALJ further found that "[w]hile the claimant certainly has chronic back pain, the evidence fails to establish that he would be unable to perform light work."  (*Id*., PageID.61).  In her opinion, the ALJ thoroughly discussed both Brown's reported symptoms as well as the submitted medical opinion evidence.  (*Id*., PageID.59-62).  Furthermore, to the extent that the medical record evidence pointed to by Brown contains his statements regarding his subjective symptoms, these are not objective findings.

Nonetheless, as Brown points out, the ALJ failed to mention an October 2017 EMG study, a January 2019 bilateral knee x-ray study, and a February 2019 MRI of his lumbar spine.  The October EMG study's "findings [were] consistent

30

with a sub-acute right S1 Radiculopathy with ongoing denervation noted.  There

[was] no electrodiagnostic evidence of left lower extremity radiculopathy."  (ECF

No. 10-12, PageID.1550).  The January 2019 x-rays showed evidence of worsening

degenerative osteoarthritis.  (ECF No. 10-14, PageID.1901-1902).  Meanwhile, the

February 2019 MRI's findings were as follow:

> 1. There are appears [sic] to be displacement of the intervertebral disc
> prothesis at L4-L5 and to the left lateral recess.
> 2. Moderate severe spinal canal stenosis above the prosthesis at L3-L4
> as detailed.
> 4. [sic] Foraminal stenosis on the left at L5-S1 with right paracentral
> disc extrusion at L5-S1.  Correlation with CT scan of the lumbar spine
> is helpful to further characterize the displaced disc prosthesis at L4-L5.

(*Id.*, PageID.1907).

"There is no requirement that the ALJ discuss every piece of evidence in the

administrative record."  *Flowers v. Comm'r of Soc. Sec.*, No. 14-12449, 2015 WL

4274961, at *4 (E.D. Mich. July 14, 2015) (citing *Kornecky v. Comm'r of Soc.

Sec.*, 167 F. App'x. 496, 508 (6th Cir.2006)).  Thus, the ALJ's failure to

specifically discuss the aforementioned evidence does not necessarily mean that

she failed to consider it.  However, assuming *arguendo* that the ALJ did fail to

consider the evidence, the Commissioner correctly argues that the evidence

"provide[s] no information about the functional effects of his impairments."  (ECF

No. 14, PageID.1961).

31

In *Flowers*, the court noted that an MRI and CT scan reports concerning the plaintiff's neck "provide[d] no insight into what additional limitations Plaintiff may suffer from based on the diagnoses therein." *Flowers*, at *4. The court went on to say that "[a]t most, Plaintiff leaves the ALJ and the Court to speculate with regard to any possible limitations related to his neck." *Id*. This case is analogous to *Flowers* because the evidence cited by Brown does not provide insight into what additional limitations he may suffer from. Further, Brown does not connect the dots for the Court by explaining the additional limitations he suffers from as demonstrated by the evidence. Under these circumstances, the evidence cited by Brown does not demonstrate that the ALJ erred when evaluating his subjective symptoms.

Furthermore, even if the ALJ should have crafted a more restrictive RFC based on Brown's subjective complaints, there was no prejudicial error as the VE considered a more restrictive hypothetical. The ALJ posed a hypothetical to the VE regarding what jobs would be available to Brown if he was limited to sedentary work. (ECF No. 10-2, PageID.108-109). The VE testified that an individual limited to such work could perform the roles of administrative support clerk, packer, and sorter, and that those jobs accounted for approximately 189,000 jobs in the national economy. (*Id*.). Thus, even if the ALJ had limited Brown to sedentary work, the ALJ still would not have determined that Brown was disabled.

VI.   Conclusion

In sum, Brown has failed to demonstrate that a remand is warranted on either of his arguments or that he is entitled to benefits.  Accordingly, for the reasons set forth above, it is RECOMMENDED that the Commissioner's motion be GRANTED, Brown's motion be DENIED, and that under sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.


Dated: August 12, 2021                          s/Kimberly G. Altman
Detroit, Michigan                                 KIMBERLY G. ALTMAN
                                                  United States Magistrate Judge


## **NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their
respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on August 12, 2021.


s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager